UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DREW STRIEGEL,

    *Plaintiff,*

    *v.*                                                      Case No: 3:23-cv-874

DONNA K. MURPHY, SGT. NICHOLAS KLIMPKE,
JASON KING, JOHN DOE 1, JOHN DOE 2,
JOHN DOE 3, JOHN DOE 4, & JOHN DOE 5,

    *Defendants.*

## COMPLAINT

Plaintiff Drew Striegel, by his attorneys, Strang Bradley, LLC, for his complaint against Defendants, state:

### INTRODUCTION

1. This is a civil rights case against the above employees of the Jackson Correctional Institution for violating the Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment.

2. This lawsuit seeks to vindicate the violation of Plaintiff's constitutional rights. It seeks to effect change through punitive damages by punishing the Defendants for their egregious conduct with the hope that the punishment is significant enough to prevent this from happening again in the future.

## JURISDICTION AND VENUE

3. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

4. This Court has jurisdiction over federal claims pursuant to 28 U.S.C. § 1331.

5. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein occurred within this judicial district.

## PARTIES

6. Plaintiff Drew Striegel is a resident of the State of Wisconsin.

7. Defendant Donna Murphy was, at the time of this occurrence, employed as a food service manager with the Jackson Correctional Institution. Defendant Murphy engaged in the conduct complained of while she was on duty and in the course and scope of her employment with the Jackson Correctional Institution.

8. Defendant Sergeant Nicholas Klimpke was, at the time of this occurrence, employed as a correctional officer with the Jackson Correctional Institution. Defendant Klimpke engaged in the conduct complained of while he was on duty and in the course and scope of his employment with the Jackson Correctional Institution.

9. Defendant Jason King was, at the time of this occurrence, employed as the food service administrator at the Jackson Correctional Institution. Defendant King engaged in the conduct complained of while he was on duty and in the course and scope of his employment with the Jackson Correctional Institution.

10. Defendant John Doe 1[1] was, at the time of this occurrence, employed as a food service worker with the Jackson Correctional Institution. Defendant John Doe 1 engaged in the conduct complained of while she was on duty and in the course and scope of her employment with the Jackson Correctional Institution.

11. Defendant John Doe 2[2] was, at the time of this occurrence, employed as a food service worker with the Jackson Correctional Institution. Defendant John Doe 2 engaged in the conduct complained of while she was on duty and in the course and scope of her employment with the Jackson Correctional Institution.

12. Defendant John Doe 3[3] was, at the time of this occurrence, employed as a food service worker with the Jackson Correctional Institution. Defendant John Doe 3 engaged in the conduct complained of while she was on duty and in the course and scope of her employment with the Jackson Correctional Institution.

13. Defendant John Doe 4[4] was, at the time of this occurrence, employed as a correctional officer with the Jackson Correctional Institution. Defendant John Doe 4 engaged in the conduct complained of while he was on duty and in the course and scope of his employment with the Jackson Correctional Institution.

14. Defendant John Doe 5[5] was, at the time of this occurrence, employed as a food service worker with the Jackson Correctional Institution. Defendant John Doe 5

---

[1] Believed to have the first name "Janet."
[2] Believed to have the first name "Stephanie."
[3] Believed to have the first name "Beth" or "Elizabeth."
[4] Believed to have the last name "Krone."
[5] Believed to have the first name "Lisa."

engaged in the conduct complained of while she was on duty and in the course and scope of her employment with the Jackson Correctional Institution.

**FACTS**

15. In May of 2022, Plaintiff Drew Striegel was a prisoner at Jackson Correctional Institution.

16. Willum Coleman, Floyd Brady, and Matthew Dennis were also prisoners at Jackson Correctional Institution during that time.

17. At the time of the occurrence, Coleman, Brady, and Dennis worked in the prison's main kitchen, where they assisted the prison's hired cooks and chefs.

18. The prison's main kitchen was responsible for preparing food for the inmates' consumption.

19. The inmates at Jackson Correctional Institution must eat meals prepared by the kitchen unless they have enough money to purchase other food.

20. Inmates Coleman, Brady, and Dennis, along with other inmates who worked in the kitchen, would cook meals that would be served to the inmates later that day.

21. They also began preparation for meals for the following day and assisted with unloading deliveries of new packages of meat and storing it in the freezer.

22. Inmate workers are supposed to place the newly arrived meat in the back of the freezer and then move the older meat toward the front of the freezer.

23. The meat at the front of the freezer is then unpackaged and used to cook meals.

24. This practice helps ensure that the meat in the freezer does not expire.

25. However, Jackson Correctional Institution deviated from this practice starting in approximately 2020.

26. During that time, the kitchen staff began loading new meat in the front of the freezer so that they did not have to move as many boxes.

27. This caused some packages of meat to stay in the back of the freezer for long periods of time without being cooked.

28. At some point in or around 2022, the kitchen staff re-adopted the practice of moving the older meat to the front of the freezer when new packages of meat arrived.

29. After re-adopting this practice, the inmates who worked in the kitchen realized that some of the meat had been sitting in the back of the freezer for over a year and was now expired.

30. The inmates working in the kitchen realized that this expired meat would eventually reach the front of the freezer and be served to the inmates.

31. Some of the inmates who worked in the kitchen informed Defendant Donna Murphy that the meat that would soon be at the front of the freezer was expired and rotten.

32. As a result of this conversation, Defendant Murphy had personal knowledge that the kitchen would eventually serve the inmates expired meat.

33. Despite having personal knowledge of the expired meat, Defendant Murphy told the inmates who had approached her about the meat not to throw the meat away; rather, they should rotate the meat to the front of the freezer anyways.

34. On or about May 9, 2022, Brady and other inmates were working in the main kitchen.

35. Brady and the other inmates observed the beef they were preparing to cook appeared to be yellowish brown.

36. Based on their experience working in the prison's main kitchen, Brady and the other inmates knew that the color of the meat was abnormal.

37. Brady and the other inmates first told Defendant John Doe 5, who was also in the kitchen, that the meat appeared rotten.

38. At this point, Defendant John Doe 5 had personal knowledge that the kitchen was preparing to serve rotten meat to the inmates.

39. However, despite having personal knowledge of this information, Defendant John Doe 5 instructed the inmates to continue to prepare the meat to be cooked.

40. Later that shift, Brady and other inmates told Defendants Murphy, John Doe 1, John Doe 2, and John Doe 3 that the meat they were preparing to cook appeared rotten.

41. At this point, Defendants Murphy, John Doe 1, John Doe 2 and John Doe 3 had personal knowledge that the kitchen was preparing to serve rotten meat to the inmates.

42. However, despite having personal knowledge of this information, one of the defendants stated, "there's nothing we can do about it, just serve it anyways," or words to that effect.

43. Despite having personal knowledge that the meat was rotten, none of the remaining defendants instructed the inmates not to cook the meat.

44. Following their shift, at least one of the inmates who had worked on the shift wrote to Defendant King to inform him that the meat the kitchen was preparing to be served was not fit for human consumption.

45. As a result of this correspondence, Defendant King had personal knowledge that the kitchen was preparing to serve rotten meat to the prison's inmates.

46. Despite having personal knowledge of this information, Defendant King did nothing to prevent the rotten meat from being prepared to be served to the inmates.

47. As part of their kitchen responsibilities, Coleman and other inmates working in the kitchen unpackaged meat from the freezer so that it could be prepared, cooked, and served to inmates.

48. On or about May 10, 2022, Coleman and other inmates were tasked with unpacking and preparing beef from the freezer.

49. Coleman and another inmate working in the kitchen observed that the beef they had been assigned to unpack was expired and appeared rotten.

50. Coleman told the correctional kitchen staff, including Defendants Murphy, John Doe 1, John Doe 2, John Doe 3, and John Doe 5 that the beef was expired and rotten.

51. Despite having personal knowledge of the condition of the meat, a member of the correctional kitchen staff told Coleman and the other inmates to cook spaghetti with the expired meat.

52. Coleman and the kitchen staff then prepared spaghetti using the expired beef.

53. Despite having personal knowledge that the meat was rotten and would eventually be served to the inmates, Defendants Murphy, John Doe 1, John Doe 2, John Doe 3, and John Doe 5 allowed the inmates to prepare spaghetti with the meat.

54. The spaghetti containing the expired beef was served to inmates, including the Plaintiff, on or about May 11, 2022.

55. As a result of this meal, the Plaintiff became ill and showed signs of severe gastrointestinal issues.

56. On or about May 11, 2022, inmates working in the kitchen were tasked with unpacking and preparing turkey meat.

57. Coleman and other inmates working in the kitchen observed that the beef and turkey they were instructed to prepare were discolored and rotten.

58. Inmate Dennis was working the pulp machine in the main kitchen at the time the meat was being prepared.

59. Prior to his incarceration, Dennis worked as a cook.

60. As Dennis worked, he noticed a smell that he recognized to be rotten meat.

61. Two inmates who were working in the kitchen informed Dennis that the smell was coming from the meat.

62. Dennis then observed that the meat was severely discolored and emanated the smell of rot.

63. After making this observation, Dennis informed Defendants John Doe 1 and John Doe 5 that the meat was rotten.

64. Defendants John Doe 1 and John Doe 5 indicated that they were already aware of the condition of the meat.

65. They further stated that Defendant King had instructed the kitchen to serve the meat despite its condition.

66. Two of the boxes of turkey that were supposed to be prepared that day had mold growing on them.

67. Coleman and other inmates working in the kitchen also informed the kitchen staff, including Defendants Murphy, John Doe 1, John Doe 2, John Doe 3, and John Doe 5 that the meat was not suitable to eat.

68. Following these conversations, Defendants Murphy, John Doe 1, John Doe 2, John Doe 3, and John Doe 5 had personal knowledge that the meat was expired and rotten.

69. The correctional kitchen staff told Coleman and other inmates working in the kitchen to prepare the turkey anyway.

70. Despite having knowledge that the meat the kitchen was preparing was rotten and not fit for human consumption, Defendants Murphy, John Doe 1, John Doe 2, John Doe 3, and John Doe 5 did not attempt to prevent the rotten meat from being served to the inmates.

71. Defendants John Doe 3 later instructed the inmates to throw out the two moldy boxes of turkey.

72. However, the remaining meat, which Defendants Murphy, John Doe 1, John Doe 2, John Doe 3, and John Doe 5 knew to be rotten and expired, was prepared for the inmates to consume.

73. Beginning on May 12, 2022, Defendant King began receiving reports that the meals being served to the inmates tasted spoiled, rotten, and rancid.

| | |
|---|---|
| Date Complaint Acknowledged: | 05/26/2022 |
| Date Complaint Received: | 05/26/2022 |
| Subject of Complaint: | 13 - Food |
| Person(s) Contacted: | Mr. King, Food Service Administrator; Ms. Maassen, HSU Nursing Supervisor; |
| Document(s) Relied Upon: | Shift Reports 5/13/22; |
| Brief Summary: | PIOC alleges that he consumed spoiled ground beef. |
| Summary of Facts: | PIOC Coleman alleges he ate "spoiled" ground beef on 5/13/22. He claims later that evening he experienced vomiting and stomach pain. According to Mr. King, Food Service Administrator, he had received I/I Requests from PIOCs and reports alleging the meals tasted spoiled/rotten/rancid starting on May 12th. While there may possibly have been freezer burned ground turkey, it was inadvertently put in some of the recipes between 5/13 and 5/14. The Main Kitchen did not serve any recipes that contained ground turkey on 5/12/22. The reported complaints were from the taco meal (served on the evening of 5/13) and also from the sausage gravy meals. Mr. King further explained, in order to remedy the problem Food Service discarded the ground turkey from the freezer with the same delivery date. He added, "The only thing wrong with the meat was the taste. Freezer burnt meat is still safe to eat." Mr. King provided the following information: |

Inmate Contacted? No

74. Following these reports, Defendant King had personal knowledge that the inmates were being served meat that was not fit for human consumption.

75. Despite having this personal knowledge, Defendant King did not attempt to prevent additional rotten meat from being served to the inmates.

76. On May 12, 2022, Coleman and other inmates were tasked with unpacking and preparing ground beef.

77. The beef Coleman was told to unpack and prepare that day was packaged on July 2, 2020.

78. The meat was sent to Jackson Correctional Institution on January 28, 2021.

79. There is photographic evidence of the meat's packaging and shipment date.





80. Upon information and belief, the company that sold the meat to the Jackson Correctional Institution says that the meat should be consumed within 12 months of being packaged.

81. The ground beef Coleman unpacked that day looked yellow in color and was covered in foam once it was taken out of the box.

82. The inmates working in the main kitchen informed the hired kitchen staff, including Defendants Murphy, John Doe 1, John Doe 2, John Doe 3, and John Doe 5, that the beef was expired, discolored, and not fit for human consumption.

83. After the inmates told the correctional kitchen staff about the state of the beef, Defendants Murphy, John Doe 1, John Doe 2, John Doe 3, and John Doe 5 had personal knowledge that the beef was not suitable for human consumption.

84. The correctional kitchen staff members instructed Coleman and other inmates to prepare and cook the spoiled meat.

I, __Willum J. Coleman__, declare under the penalty of perjury:

1. I witness the ground beef served on May 12-14, 2022, look yellow with foam after opening the boxes of meat while working in the Jackson Correctional Institution Main Kitchen.

2. I asked the chef's to not serve the meat and we were instructed to prep and cook it anyway.

3. I am competent and willing to testify to these matters stated in this affidavit.

Pursuant to 28 U.S.C. 28 § 1746, I, __Willum J. Coleman__, declare under the penalty of perjury that the forgoing is true and correct to the best of my personal knowledge and belief.

Date this __18__ day of May, 2022.

_/s/ Willum J Coleman_

I, __Floyd Brady #581469__, declare under the penalty of perjury:

1. I witness the ground beef served on May 12-14, 2022, look yellow with foam after opening the boxes of meat while working in the Jackson Correctional Institution Main Kitchen.

2. I asked the chef's to not serve the meat and we were instructed to prep and cook it anyway.

3. I am competent and willing to testify to these matters stated in this affidavit.

Pursuant to 28 U.S.C. 28 § 1746, I, __Floyd Brady #581469__, declare under the penalty of perjury that the forgoing is true and correct to the best of my personal knowledge and belief.

Date this __12-14__ day of May, 2022.

_/s/ Floyd Brady_

85. Despite having personal knowledge that the beef was expired, discolored, and not fit for human consumption, Defendants Murphy, John Doe 1, John Doe 2, John Doe 3, and John Doe 5 allowed the inmates to prepare and cook the expired meat.

86. On or about May 13, the inmates at Jackson Correctional Institution, including the Plaintiff, were served tacos containing the spoiled meat for dinner.

87. As a result of this meal, the Plaintiff became ill and showed signs of gastrointestinal issues.

88. Coleman and other inmates in the kitchen were also instructed to use the spoiled meat as part of the cream beef being prepared for lunch.

89. On May 14, 2022, inmates at Jackson Correctional Institution, including the Plaintiff, were served cream beef for lunch.

90. As a result of this meal, the Plaintiff became ill and showed signs of gastrointestinal issues.

91. Between May 11–15 2022, the inmates, including the Plaintiff, were also served sausage gravy containing the expired meat.

92. In May of 2022, Jamie Anderson was an inmate at the Jackson Correctional Institution.

93. At some point between May 11 – May 15, 2022, Anderson told Defendants Klimpke and John Doe 4 that the inmates were being served expired meat.

94. As a result of this conversation, Defendants Klimpke and John Doe 4 had personal knowledge that the inmates were being served expired meat not fit for human consumption.

95. Defendant Klimpke told Anderson that they would not replace the meat.

96. Defendant John Doe 4 told Anderson that he was aware of the expired meat and stated, "Sucks to be you guys. I wouldn't serve that shit to my dog."

97. Despite having personal knowledge that the inmates were being served rotten meat, Defendants Klimpke and John Doe 4 did not attempt to prevent additional rotten meat from being served to the inmates.

98. On May 26, 2022, the correctional kitchen staff had Coleman and other inmates working in the kitchen throw out the remaining expired beef.

99. The Plaintiff filed grievances and exhausted all potential administrative remedies.

## COUNT 1:
## 42 U.S.C. § 1983 Claim for Conditions of Confinement

100. Plaintiff realleges the above paragraphs.

101. Serving Plaintiff expired and spoiled meat subjected him to a strong likelihood of serious harm, including gastrointestinal issues.

102. The Defendants were aware of the strong likelihood that Plaintiff would be seriously harmed or strongly suspected facts showing a strong likelihood that Plaintiff Striegel would be seriously harmed but refused to confirm whether these facts were true.

103. The Defendants consciously failed to take reasonable measures to prevent harm or prevent additional harm from occurring.

104. Plaintiff would not have been harmed or would have suffered less harm if the Defendants had taken reasonable measures.

105. The Defendants acted under the color of law.

106. The Defendants thus violated Plaintiff Striegel's Eighth Amendment right to be free from cruel and unusual punishment.

WHEREFORE, pursuant to 42 U.S.C. §§ 1983 & 1988, Plaintiff demands actual or compensatory damages against Defendants, the costs of this action, attorneys' fees, and such other further relief that the Court deems just and equitable. And because Defendants acted maliciously, wantonly, or oppressively, Plaintiff demands punitive damages.

**JURY DEMAND**

Plaintiff demands a trial by jury, pursuant to FED. R. CIV. PRO. 38(b), on all issues so triable.

Respectfully submitted,

Dated: December 19, 2023

/s/ William E. Grau
William E. Grau
  Wisconsin Bar No. 1117724
R. Rick Resch
  Wisconsin Bar No. 1117722
John H. Bradley
  Wisconsin Bar No. 1053124
STRANG BRADLEY, LLC
613 Williamson Street, Suite 204
Madison, Wisconsin 53703
(608) 535-1550
William@StrangBradley.com
Rick@StrangBradley.com
John@StrangBradley.com

Attorneys for Plaintiff

Filename: Striegel Complaint [V2].docx
Directory: /Users/krm/Library/Containers/com.microsoft.Word/Data/Documents
Template: /Users/krm/Library/Group Containers/UBF8T346G9.Office/User Content.localized/Templates.localized/Normal.dotm
Title:
Subject:
Author: First Last
Keywords:
Comments:
Creation Date: 12/19/23 12:31:00 PM
Change Number: 2
Last Saved On: 12/19/23 12:31:00 PM
Last Saved By: Sam Smith
Total Editing Time: 0 Minutes
Last Printed On: 12/19/23 12:31:00 PM
As of Last Complete Printing
   Number of Pages: 16
   Number of Words: 2,968
   Number of Characters: 14,814 (approx.)